IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DAREL HARGROVE<br>    Plaintiff,<br><br>vs.<br><br>THE UNIVERSITY OF TEXAS<br>A&M MAYS SCHOOL OF BUSINESS;<br>MICHAEL K. YOUNG, PRESIDENT,<br>THE UNIVERSITY OF TEXAS<br>A&M MAYS BUSINESS SCHOOL<br>In his Official Capacity; and,<br>ELI JONES, DEAN,<br>UNIVERSITY OF TEXAS   A&M<br>MAYS  BUSINESS   SCHOOL<br>In his  Official Capacity;<br>TERESA WILCOX,<br>OMBUDS OFFICER,<br>UNIVERSITY OF TEXAS A&M,<br>In her Official Capacity<br>    Defendants. | No. 4:17-cv-402 |

PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES PLAINTIFF, DAREL HARGROVE , complaining of Defendants, THE University of Texas A&M Mays School of Business ; Michael K. Young, President of the University of Texas A&M, In his Official Capacity; Eli Jones, Dean of the University of Texas A&M Mays School of Business, in his Official Capacity ; and, Teresa Wilcox, Ombuds Officer at the University of Texas A&M Mays School of Business Professor, in her Official Capacity, (collectively termed the A&M Defendants), and in support thereof for his causes of action would respectfully show this Court as follows:

## I. NATURE AND PURPOSE OF THE ACTION

1. Darel Hargrove is of African American descent. When he entered the Texas A&M Mays Business School he had high hopes of pursuing his dream of completing his Ph. D and eventually becoming a professor and researcher. Unfortunately, due to the acts and omissions of the various A&M Defendants based upon racial animus, among other things, as more fully described below, his dream has turned into a nightmare. When he was dismissed from the school his "good name" was forever maligned. Further he is now in a significant amount of debt. What is particularly troubling is that the very work that Darel Hargrove submitted to the A&M Defendants which was deemed as unworthy has now been published by other professional and educational organizations.

2. The Texas A&M University is not only one of the most esteemed centers of education here in Texas but throughout the Unites States. By extension, its various professional and graduate programs, including and especially the Mays Business School, are likewise excellent environments for education and training for Caucasian students. Unfortunately, like most programs steeped in tradition and culture, some customs of the school rest upon vestiges of racial discrimination. None of these customs and practices pass constitutional muster.

3. For these and the following acts and omissions by the Mays Business School Defendants Plaintiff seeks damages and compensation for the injuries more fully discussed below. Plaintiff has a property right and liberty interest in his education pursuant to the Due Process Clause of the 14th Amendment United States Constitution, a *Contract Claim* pursuant to Section 1981 of the Civil Rights Acts, and a claim related to Title VI of the Civil Rights Act

of 1964. As such he brings forth this cause of action based upon such failures as noted above, and as will be more fully described below.

## II. JURISDICTION

4. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States including 42 U.S.C. §1981, §1983 and §2000d et seq.

5. In addition, jurisdiction is conferred upon this Court pursuant to Sections 1980 and 1983 of the Constitution of the United States, and the federal laws and regulations issued thereunder.

## III. VENUE

6. Under 28 U.S.C. § 1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs claims occurred in the Southern District of Texas.

## IV. PARTIES

7. Darel Hargrove is of African American descent. He lived in Bryan, Texas during all times pertinent to this Complaint when he was a student at the Texas A&M Mays Business School.

8. Defendant, Texas A&M University [ "Mays", the "Program", or the "School"] is a higher level, professional post-graduate, state educational institution located in Brazos County, Texas. One of the Academic Departments offered by the School is The Mays Business School. Service of process on Defendant may be effected by serving its President: Michael K. Young, 1246 TAMU, Texas A&M University, College Station, TX 77843-1246.

9. Defendant, Michael K. Young, President; Texas A&M Mays Business School, [hereinafter Young], is being sued in his official capacity. He is a person for purposes for 42 U.S.C.

§1983 in his official capacity. He works or resides in San Antonio, Bexar County, Texas. Service of Process on Defendant may be effected on him by serving him at: 1246 TAMU, Texas A&M University, College Station, TX 77843-1246 or wherever he may be found.

10. Defendant, Teresa Wilcox, Omsbud Official at the University of Texas A&M Mays School of Business Professor [hereinafter "Wilcox"], is being sued in her official capacity. She is a person for purposes for 42 U.S.C. §1983 in her individual capacity. She works or resides in College Station, Brazos County, Texas. Service of Process on Defendant may be effected by serving her personally at Mays Business School, Wehner Building, Texas A&M University, 4113 TAMU | 210 Olsen Blvd, College Station, Texas 77843-4113 or wherever she may be found.

11. Texas A&M is a public University that receives in part money fro the federal government. As such it is required to follow, among other things, the anti-discrimination standards as set out by Title VI of the Civil Rights Acts of 1964; 42 USC 2000 D; et seq; and the and the federal rules propulgated there under. As the following narrative demonstrates the Texas A&M University discriminated against Darel Hargrove based upon race, and failed to follow federal laws and rules.

V.   STATEMENT OF FACTS

12. Darel Hargrove is of African American descent. Prior to attending Texas A&M, he graduated from several other prestigious schools, including: Morehouse College, with a Business Administration degree with a concentration in Marketing; Dartmouth College's Amos Tuck School of Business, where he completed an MBA with a concentration in Strategic Management; and the Purdue University Krannert Business School where he

graduated with a Masters of Science in Organizational Behavior and Human Resources.

13. Darel Hargrove arrived on the campus A&M on August 21, 2012, Mr. Hargrove entered his first class just as his name was being read from a board listing the incoming students by Deidra Schleicher. Ms. Schleicher had also formerly taught a class Mr. Hargrove took at Purdue University. Upon entering the class he heard her loudly remark in a tone that suggested she was displeased to see his name that "there couldn't possible be *two* Darel Hargroves?" After individuals near her indicated that Darel had entered the room she simply stood and offered no greeting, explanation or apology. Mr. Hargrove attempted to smooth over the awkwardness by greeting her and offering her a hug. Her response was to stand with her arms at her sides and ignore him.

14. Darel Hargrove was given two "RA assignments"; one was Murray Barrick and the other was Dan Chiaburu.

15. Hargrove's initial meeting with Barrick seemed very positive. After looking over his resume, Barrick excitedly remarked that he thought Darel would be "a big help to our research around here". The excitement would prove to be short lived.

16. While every other student within the group was assigned a duty that allowed them to build research skills such as interpreting data, Mr. Hargrove was tasked with the simple clerical task collecting names and contact information for equity analysts of Fortune 500 companies.

17. (Mr. Hargrove attempted to become involved with other projects but was refused.)

18. Further, during these first few weeks Deidra Schleicher encouraged Mr. Hargrove to quit the Program during a seminar on Organizational Behavior.

19. A few weeks later Schleicher lectured on the "Bell Curve"; during this discussion it was

argued that minorities lack 'values' which accounts for their lack of success.

20. Schleicher repeatedly showed her disdain for Darel Hargrove throughout the semester. She would intentionally ignore him both at social functions and during class discussions.

21. During this semester she also told him to "shut up" and in another incident belittled the intelligence of the instructors who had taught him previously.

22. Nevertheless, during this period, Mr. Hargrove continued to put as much effort as possible into his school work and assigned research project's tasks. He had passing grades in his courses and continued on into the Spring semester.

23. During the fifth week of Spring semester classes a different instructor, Wendy Boswell also gave a lecture on "Bell Curve" theories. Boswell's class discussion concentrated on the alleged inferiority of the intellectual abilities of African Americans, going so far as to proclaim how "sick of" African American researchers benefitting from awards she believed that had only been achieved due to the award winner's race. She specifically mentioned Quinetta Roberson. It is worth noting that Quinette Roberson possesses a PhD. and is the *Fred J. Springer Endowed Chair* in Business Leadership and a Professor of Management at the School of Business at Villanova University; she has been published at least twenty times.]

24. In February of 2013 during a meeting with Schleicher, Darel was told that she and Wendy Boswell had polled the faculty and that the consensus was that he should quit the program due to the fact that none of them felt he had the skills to be a successful researcher.

25. Mr. Hargrove was later told that this was a lie and that no "poll" had ever been taken.

26. Again despite the constant criticism and the total lack of support Mr. Hargove once again

passed all of his classes in the Spring of 2013.

27. During this time Darel had a series of conversations with a professor named Tomas Thundiyil. Thundiyil warned Darel that he would never be supported within the Program, and that if he was going to succeed he would have to train and develop his skills on his own.

28. During this same time Wendy Boswell directed Hargrove to find results for the data from a project they were working on together. Trying to figure out precisely what she was assigning him, Darel asked more particular questions regarding what she wanted done with the data. Her response was for him to "work alone and come up with something."

29. Darel discussed the data with more experienced students who informed him they had no idea what to do with the data either. When he later had a separate discussion with the department's statistics expert, he was told by her that the data was "trash" and to avoid having to work with it.

30. Seemingly, Mr. Hargrove was being left to simply wither and die as Tomas Thundiyil had warned him would happen. Clearly the Program's most opinionated and influential instructors were ensuring that Darel would never be able to get the experience he needed to pass the examination and complete the program.

31. During a conversation regarding potential projects on November 12, 2013, Darel proposed to Schleicher that he was considering a project regarding meta-analysis in justice literature. She immediately shut down the discussion, telling Darel that there was already 'a working paper' on the same subject. Mr. Hargrove would later find out this was not true. Remarkably, since then Darel has had a paper published on this very same subject.

32. The treatment of Darel Hargrove by Boswell and Schleicher raised enough concern within

the department and school that other students in the program began to take notice. Sal Mistry, who was a student with Darel in the program, complained to Boswell about Darel's treatment pointing out that no one was giving him the appropriate instruction and experience that he needed to be successful.

33. Richard Gardner, another fellow student during Darel's time at Mays expressed concern regarding why he was being given projects like sitting watching and coding hours and hours of interviews instead of being given tasks that would allow him to acquire skills and knowledge that would have enabled him to have successfully passed the examination, thereby allowing him to complete his Ph. D.

34. Throughout the entirety of the time he was enrolled in the program, Mr. Hargrove was constantly subjected to rude, unprofessional and biased treatment by Professors Boswell and Schleicher. The two made it a priority to make sure Mr. Hargrove was not given the opportunity to succeed in the program . They blackballed him from participating in any meaningful research or project in ways that would allow him to gather skills and knowledge to pass the examination. They further went out of their way to "taint" the opinions of the entire faculty and staff regarding his intelligence and capabilities.

35. They discouraged him from joining in projects for a variety of reasons, although they gave excuses such as his ideas "not being interesting enough", lying to him regarding there being an existing "working paper" during a conversation where he floated to Schleicher regarding meta-analysis in justice literature, and going to far as to having public discussions regarding their methods of blackballing students in retaliation for being displeased with a student's actions.

36. In fact, Defendants often singled out Hargrove, specifically telling students not to interact with him as was relayed to him in multiple conversations with fellow students over time.

37. Schleicher and Boswell frequently ignore Hargrove in classroom discussions when he would attempt to speak. During a seminar in Boswell's class, Schleicher was lecturing. Darel raised his hand several times throughout the discussion. He was ignored until the very end of class when literally no other student had their hand raised. When Schleicher was finally forced to call on him she replied to him with an admonishing "We do not talk that way!"

38. Clearly there was seemingly little if anything Mr. Hargrove could do to appease these individuals no matter how hard he tried. They had made up their minds regarding his capabilities and what they clearly deemed to be his inferiority early on and were not going to change their minds regardless of how hard he worked.

39. In contrast to how Darel was simply "hung out to dry" once the faculty deemed him as not being cut out for the program, Troy Smith, a white student was told by professor precisely what to study prior to his examination.

40. Further, the staff evaluated a Caucasian student, Tim Morgan, as not having the cognitive ability to pass the program (Hargrove was told the same in his performance evaluation). However, unlike Darel, Murray Barrick began "coaching" Tim Morgan weekly and he was immediately added to several projects.

41. As is required of all individuals in the Program, Darel was required to take and pass a 'comprehensive exam'. Failure to pass said exam results in dismissal from the program regardless of successful completion of coursework.

42. Prior to sitting for the exam Darel was told that questions on the exam would be related to

his field of study and/or his research focus.

43. In fact, the Mays Handbook for the program specifically states that the objectives of the exam which is given twice a year - once in June and once in January - are to "provide a mechanism to ensure that students acquire the breadth and depth of knowledge in their chosen field (OB, HRM or Strategy) and to have a "fair system that is high on procedural justice". It goes on to say that the Doctoral Program Coordinator (DPC) solicits questions for the exam from the faculty of the exam taker's chosen area. Further, it chooses the faculty members who will grade the exams in the same manner. In Darel's case this would be Boswell and Schleicher.

44. Lastly, it tells the student that should he or she fail the exam, the DPC along with the committee "will work out the next steps."

45. The entirety of this exam, from its creation, to the grading process to the appeals process for students who are deemed to have "failed" the exam is entirely determined by and dependent upon these individuals opinions, actions and choices. These are the very same individuals who have been discriminating against him from the beginning.

46. On or about July 7, 2014 Darel has a meeting to get his test results from Boswell; he is told he had failed.

47. He was informed he could take it again but that he had to do so before October 31st.

48. During the meeting Darel Hargrove expressed his belief that had he been included on and more involved in projects during the Program he would have passed; Boswell responded that he "did not deserve help or support."

49. In early October 2014 Darel met with Professor Richard Woodman to discuss options outside of Mays. Woodman explains that if he were to try to transfer A&M would not be supportive

and they would be sure to let the other school(s) know that they did not believe he was competent or capable. Darel was told that maybe teaching at a community college would be a better suited or more "appropriate" goal. He was warned that whatever he decided he could NOT 'defy' the department.

50. On October 31st Hargrove retakes the exam. Again he was not given any questions regarding his field of interest nor from his research focus. Further, he was the only student to take the exam at this time. Therefore, even if the individuals grading it did not see his name written anywhere on the actual test, everyone in the department would clearly be aware that this was his test they were grading.

51. In the interim of time that he is awaiting the results Hargrove finds out that a Caucasian student who had retaken the exam, Andy Hinrich, that he was allowed to wait until January to retake the exam.

52. On November 4th Boswell informs Hargrove he has again failed. During the meeting Darel asks why he was not given until January to retake the exam as other students were, pointing out how much more time he would have had to study since he was concurrently dealing with the stress and workload of teaching his first class. Boswell responded that he had requested to take the test at that time. This was an intentional misrepresentation of the facts.

53. During the latter part of November while trying to out together an intra-department appeal to Duane Ireland, Hargrove is warned by an Associate Dean, Bala Shetty, that regardless of what his concerns were regarding the reason(s) he believed he had been failed, that "you do not want to proceed with accusations of racial misconduct."

54. In February 2015 Darel Hargrove is notified the latest appeal was accepted and he will be

allowed to retake the test again during the summer testing period. He is further given the impression that another student will take the test with him thereby making the "blinded grading"plausible.

55. On February 26, 2015 Wendy Boswell called Hargrove into her office. She demands that he have her removed from his dissertation committee and tells him she does not agree with the fact that his appeal has been granted and that he will be allowed to retake the exam. Finally she informs him she will "NEVER support his candidacy."

56. Upon his arrival to take the exam on June, 21 2015 Hargrove discovers that Wendy Boswell is the proctor for the exam.

57. On July 15, 2015 Murray Barrick notifies him that he has again failed the exam and is being dismissed from the program. During this same time he begins communicating with the Ombudsman, Teresa Wilcox, to discuss the fact that he believes that all of this is due to the racial prejudice within the department. Wilcox informs him that TAMU does not recognize appeals that based upon racial discrimination and that the only manner for him to appeal this was through the Mays School which has no such appeals process either. Wilcox was dismissive of all of his concerns telling him that the only was to appeal the decision in a way that would even be considered was to make the case on terms and grounds that did not address prejudice or racism at all.

58. On August 21, 2015 he files his an appeal with the Program to Murray Barrick. Within days his email through the department is shut off. On September 5, 2015 he is told this appeal has been denied as well. Shortly thereafter TAMU police are despatched to his apartment to retrieve the key to his office.

59. On September 29, 2015, Duane Ireland contacts him to tell him that the next step of the appeals process if to form a committee from faculty members who had not been involved with him directly up to this point and one person from outside the department.

60. Following the decision of the appeals committee Darel makes a last ditch effort to make his case for being wrongly dismissed from the program. He meets with the then-newly appointed Dean Eli Jones. Eli Jones greeted Darel by telling him "I have heard about you"; he also refused to shake his hand. Darel explains the same concerns to Mr. Jones as he had in previous email between the two - the lack of support he had received during his time at Mays and his concerns about racial discrimination . He explained in detail to Jones that Caucasian students had said that they were given exam questions prior to the exam, he discusses Tim Morgan and the "coaching" sessions he was given by Barrick and how Boswell had bragged about retaliating on 'students she did not like by "blackballing" them.

61. At the conclusion of their meeting, Eli Jones promised to evaluate a model Hargrove designed and to use this as a determination of his fitness for the Program and whether he will be allowed back into the program.

62. Jones instead used a "rough draft" of a manuscript that Hargrove had written, which had not been proof-read yet and contained a number of grammar and spelling mistakes. Jones then refused to readmit Hargrove to the program citing the mistakes within the draft as the reason he will not be readmitted.

63. The Mays Defendants' actions and omissions towards Darel Hargrove showed a lack of professional judgment and were based upon racial animus, were arbitrary and capricious, and prevented him from pursuing his chosen career path. They have failed to follow

constitutional, statutory and even their own written policies and procedures. It has ruined his academic career, good name, reputation, integrity and honor, deprived him of his right to continue his education, and caused great economic injury as a result of his student loan debts.

64. More importantly, the Program has or had an practices that Hargrove, upon reason and belief, will be able to show allows or supports practices of faculty member to discriminate against students who are non-Caucasian, that non-Caucasian students tend to be disproportionately singled out for dismissal, and are not afforded the same opportunities as Caucasian students.

## VI.  STATE ACTION

65. Plaintiff incorporates by reference all the above-related paragraphs with the same force and effect as if herein set forth

66. In addition, each portion below likewise will incorporate by reference any such allegation above it, also as though set forth at length therein.

67. The Defendant School was at all times and in all matters acting under color of federal and state law in regard to the acts and omissions alleged by Plaintiff.

68. The Defendant School was at all times and in all matters receiving federal funds during the period in question.

## VII. COMPLAINT OF RETALIATION PURSUANT TO SECTION 1983

69. Hargrove incorporates and re-alleges the above-referenced allegations as though set forth at length herein.

70. The facts as previously described demonstrate that Hargrove, a member of a minority class, had his rights violated by the School pursuant to 29 U.S.C. §794 ("Rehabilitation Act") by retaliating against him on behalf of such advocacy for himself.

71. In addition, and in the alternative to the above, Hargrove has rights pursuant to the 1st Amendment to the United States Constitution to be able to redress his grievances before a governmental entity, without suffering retaliation for doing so.

## VIII. PROXIMATE CAUSE

72. Plaintiffs incorporates by reference all allegations the above related paragraphs with the same force and effect as if herein set forth.

73. Each and every, all and singular of the foregoing acts and omissions, on the part Defendants, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## IX. RATIFICATION

74. Defendants ratified the acts, omissions and customs of all other school administrators, educators, personnel, professors and staff working under their supervision.

75. As a result, these Defendants are separately and/or collectively, jointly and severally, responsible for the acts and omissions of all school administrators, educators, personnel and staff working under their supervision.

## XIII. DAMAGES

76. Plaintiff incorporates by reference all the above related paragraphs, as if fully set forth herein

77. As a direct and proximate result of these Defendants' conduct, separately and/or collectively, jointly and severally, Plaintiff has suffered injuries and damages, which he may seek compensation thereby, all within the jurisdictional limits of this court, including but not limited to the following:

   a. Reimbursement of all tuition;

    b.    Lost wages, in the future and in the past;

    c.    Mental anguish in the past; and

    d.    Mental anguish in the future.

78. By reason of the above, the subject of this lawsuit, Plaintiff has suffered losses and damages in a sum within the jurisdictional limits of the Court and for which this lawsuit is brought.

## XVI.  PUNITIVE DAMAGES

79. Plaintiff incorporates by reference all the above related paragraphs, as if fully set forth herein.

80. A review of the acts and omissions of the various Defendants evidence that Plaintiff was a victim of discrimination based upon race and such discrimination was due to the conscious indifference and deliberately indifference of Defendants, who have acted with wanton disregard to the rights of Plaintiff Hargrove and as such, are liable to him for Punitive Damages.

## XVII.  ATTORNEY FEES

81. Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth herein.

82. It was necessary for Plaintiff to hire the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiff is entitled to an award of attorney fees and costs under violations pursuant to Section 1988 of the Civil Rights Acts.

## XVIII.  DEMAND FOR JURY TRIAL

83. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial for all issues in this matter.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against The Texas A&M University Defendants, separately and/or collectively, jointly and severally, in the manner and particulars noted above, and in an amount sufficient to fully compensate him for the elements of damages enumerated above, including reinstatement to the Mays Business School program, judgment for damages, recovery of attorney's fees and costs for the preparation and trial of this cause of action, and for its appeal if required, pursuant to violations pursuant to Section 1988 of the Civil Rights Acts, together with pre- and post-judgment interest, and court costs expended herein, and for such other relief as this Court in equity, deems just and proper, including but not limited to readmission to the program.

Respectfully submitted,
Cirkiel & Associates, P.C.

/s/ Mr. Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq.
State Bar No. 00783829
Fed. ID# 21488
1901 E. Palm Valley Blvd.
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]
ATTORNEY FOR PLAINTIFF